## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KATHY MELVIN,

                  **Plaintiff,**

   **v.**                                    **1:05-cv-1129-WSD**

WORLDSPAN, L.P.,

                  **Defendant.**

## OPINION AND ORDER

This is an action in which Plaintiff Kathy Melvin ("Plaintiff") seeks to require Defendant Worldspan, L.P. ("Defendant) to include Plaintiff's years of service with Northwest Airlines when computing her pension benefit under a pension plan subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, <u>et seq.</u>  It is before the Court on Defendant's Motion for Summary Judgment [60].

## I.   **BACKGROUND**

### A.   The Parties

Defendant is a provider of travel technology services.  (Def.'s Statement of Material Facts ("DSMF") ¶ 1.)  It was formed through a partnership consisting of Northwest Airlines, Delta Airlines and Trans World Airlines.[1]  (Id.)

From November 21, 1977 until August 5, 1990, Plaintiff worked for Northwest Airlines or one of its predecessor airlines.[2]  (PSMF ¶ 1; DSMF ¶¶ 3, 8.) While employed by Northwest Airlines, Plaintiff was a member of the International Airline Machinists union and she participated in the pension plan for union employees.  (DSMF ¶ 9.)

Plaintiff applied for a position with Defendant.  When applying for the position, Plaintiff interviewed with Ken Hulse and George Dunwoody, Help Desk Supervisors employed by Defendant.  (DSMF ¶ 26; PSMF ¶ 4.)  During the

---

[1]  As part of the partnership, Defendant and Northwest Airlines entered into an Employee Assignment Agreement (the "Assignment Agreement").  (Pl.'s Statement of Material Facts ("PSMF") ¶ 2.)  Under the Assignment Agreement, employees had six years in which to opt to return to the airline after they were assigned to Defendant.  (Id.)

[2]  This continuous employment was interrupted by a two-year period during which Plaintiff was furloughed.  (DSMF ¶ 8.)

interview, Plaintiff discussed her benefits with Mr. Hulse and Mr. Dunwoody. (DSMF ¶ 27; Pl.'s Resp. to DSMF ¶ 27.)  Defendant offered Plaintiff a position at the help desk on August 6, 1990, and on that same day Plaintiff began working for Defendant.  (DSMF ¶ 30.)[3]  In 2004, Plaintiff worked as a Q/A Analyst in the Fares and Pricing Department.  (Id.)  In this position, Plaintiff was responsible for testing applications and resolving software issues referred to the department from the help desk.  (Id.)

While employed by Defendant, Plaintiff received annual performance reviews.  (PSMF ¶ 8.)  Each performance review from 1999 through September 2003 rated Plaintiff as satisfactory.[4]  For example:

---

[3] Northwest Airlines employees transferring to Defendant retained their seniority date for purposes such as job bidding, vacation, flight benefit and sick leave, and Plaintiff could have returned to Northwest Airlines for a period of six years while retaining her seniority.  (DSMF ¶¶ 4, 10.)  Plaintiff never sought to return to Northwest Airlines.  (DSMF ¶ 11.)  It is unclear what pension benefits Plaintiff may be entitled to from pension plans she participated in while employed by Northwest Airlines.

[4] Plaintiff's job title changed during this period -- in 1999 she was an "Instructional Designer"; in 2000 she was a "QE Analyst"; in 2001 she was a "Q/A Analyst"; and in 2003 she was a "Sr Q/A Analyst."  (PSMF ¶ 8; Performance Reviews, App. B-1(d-g) to Pl.'s Opp'n to Def.'s Mot. for Summ. J.)

- For the performance periods from January 1, 1999 through January 1, 2000, and April 2, 2000 through March 30, 2001, Plaintiff received an overall rating of "Is effective."

- For the performance periods from April 1, 2001 through April 1, 2002, and September 16, 2002 through September 16, 2003, Plaintiff received a rating of "Meets Expectations" in every evaluated category.

(PSMF ¶ 8.)  On February 21, 2004, Plaintiff was evaluated for the performance period of January 1, 2003 through December 31, 2003.  (PSMF ¶ 15.)  She received an overall rating of "Needs Improvement" in all categories.  (Id.)

B.     The Plans

Defendant maintains a defined benefit pension plan subject to the requirements of ERISA.  (DSMF ¶ 13.)  The Worldspan Employees' Pension Plan was effective January 1, 1987, and it was amended by Defendant in 1990 (hereafter referred to as the "1990 Plan").  (DSMF ¶ 14; Pl.'s Resp. to DSMF ¶ 14.)

Section 1.2.7 of the 1990 Plan defines "Benefit Service" as:  "a measure of a Participant's service with the Employer in Recognized Employment . . . which is equal to the total years and fractions of years of the Participant's employment in

-4-

Recognized Employment . . . ."  (DSMF ¶ 16.)  Subsection (c) of this section

further provides:  "Service with Northwest Airlines, Inc. . . . before the date the

Participant transfers to employment with the Employer . . . shall be taken into

account as if it were equivalent service with the Employer."  (Pl.'s Resp. to DSMF

¶ 16.)  Section 1.2.27 of the 1990 Plan defines "Recognized Employment" as:

> . . . all employment with the Employer, excluding
> however:
> (a) employment in a unit of employees whose terms and
> conditions of employment are subject to a collective
> bargaining agreement between the Employer and a union
> representing that unit of employees, unless such
> collective bargaining agreement provides for the
> inclusion of those employees in the Plan.

(DSMF ¶ 17.)[5]  The 1990 Plan further provides:  "The Committee shall make such

determinations as may be required from time to time in the administration of the

Plan. . . .   All decisions on claims and on requests for a review of denied claims

shall be made by the Committee."  (1990 Plan, Sections 8.1, 8.4.3(b).)

---

[5]  The Summary of Worldspan Employees' Pension Plan for the 1990 Plan
states:  "For example, since employment in a union represented job classification
for the employee would not be recognized employment, employment in a union
represented classification for Northwest Airlines, Inc., . . . would not be taken into
account in determining benefit service under this plan."  (DSMF ¶ 32.)  This
document further states:  "[the] official Plan and Trust documents and not this
summary, are controlling of all questions of interpretation."  (Pl.'s Resp. to DSMF
¶ 32.)

In 1994, Defendant amended and restated the 1990 Plan (hereafter referred to as the "1994 Plan").  (DSMF ¶ 18.)  The provisions regarding "Benefit Service" and "Recognized Employment" were not materially altered from the 1990 Plan.  (DSMF ¶¶ 19-22.)  Section 8.1 of the 1994 Plan reserved to the Administrative Committee of Worldspan's Employees' Pensions Plan (the "Committee" or "Administrator") the "sole discretion, authority, and responsibility to interpret and construe the Plan Statement and to determine all factual and legal questions under the Plan, including but not limited to . . . the entitlement of employees . . . and the amounts of [employee's] respective benefits."  (DSMF ¶ 23.)

C.     Plaintiff's Benefits

In December 2003, Plaintiff reviewed a plan statement calculating the amount of benefits she was entitled to receive.  (Pl.'s Resp. to DSMF ¶ 34; DSMF ¶ 36.)  Plaintiff claims that upon reviewing this document she became aware for the first time that her service at Northwest Airlines was not being used to calculate her Benefit Service.  (Pl.'s Resp. to DSMF ¶ 34.)[6]

---

[6] Plaintiff claims several other former Northwest Airlines employees also received similar statements in December 2003 and filed benefits claims requesting that Defendant recalculate their pensions to include their service with Northwest Airlines.  (Pl.'s Resp. to DSMF ¶ 34; DSMF ¶ 52.)

On January 11, 2004, Plaintiff submitted a letter to Defendant requesting that her Benefit Service be recalculated to include her years of service with Northwest Airlines.  (DSMF ¶ 39; PSMF ¶ 12.)  In or before February 2004, Plaintiff informed her supervisor, Vicki Boyd, that she had submitted a pension claim.  (DSMF ¶ 47; PSMF ¶ 14.)  Carl Curtiss, the Employee Benefits manager, was assigned to investigate Plaintiff's claim.  (DSMF ¶ 44.)  Mr. Curtiss reviewed the plan documents and Plaintiff's personnel file before presenting his findings to the Committee.  (DSMF ¶¶ 45-46.)  On June 3, 2004, Defendant denied Plaintiff's claim for benefits and communicated its decision to Plaintiff in writing.[7]  (DSMF ¶ 48.)  On August 2, 2004, Plaintiff appealed this denial, and, on October 1, 2004, the Committee denied Plaintiff's appeal.  (DSMF ¶¶ 49, 51.)

D.   Plaintiff's Discharge

Defendant claims it began reorganizing and downsizing in 2001 -- in January 2001 Defendant had 3,500 employees.  (DSMF ¶ 54.)  By 2005, it had only 1,800 employees.  (Id.)  Defendant further claims it began outsourcing jobs to

---

[7] The June 3, 2004 letter from Mr. Curtiss to Plaintiff regarding the denial or her benefits is an eleven-page document which thoroughly analyzes the relevant plan provisions and Plaintiff's employment history.  (See June 3, 2004 Letter, attached as Ex. B to Curtiss Decl.)

India in 2004.  (DSMF ¶ 55.)  As part of a staff reduction, Ms. Boyd was asked to eliminate the positions of ten employees.  (DSMF ¶¶ 58, 63.)  Ms. Boyd ranked the employees in her group based on skill level, functional knowledge, flexibility and initiative.  (<u>Id.</u>)  Plaintiff was ranked in the bottom two of her group.  (<u>Id.</u>)  On June 4, 2004, Plaintiff was informed she was being discharged.  (<u>Id.</u>)  At the time of Plaintiff's discharge, she was told the reasons for her discharge were "job elimination" and "lack of work."  (DSMF ¶ 63; Pl.'s Resp. to DSMF ¶ 63; PSMF ¶ 17.)

## II.   <u>DISCUSSION</u>

Plaintiff's Complaint in this action asserts claims for promissory estoppel (Count 1), declaratory judgment (Count 2), fraudulent inducement (Count 3), retaliation under ERISA (Count 4) and violation of the Age Discrimination in Employment Act (the "ADEA").  On January 6, 2006, Plaintiff voluntarily dismissed her claim under the ADEA.  (Pl.'s Withdrawal of Count Five [59].)  On January 9, 2006, Defendant moved for summary judgment on Plaintiff's state-law claims on the grounds, *inter alia*, that these claims are preempted by ERISA.  In her response brief, Plaintiff concedes "Defendant is correct that state law claims are completely preempted by ERISA."  (Pl.'s Opp'n to Def.'s Mot. for Summ. J.

("Pl.'s Opp'n") at 6.)[8]  In the absence of a claim brought for plan benefits under

ERISA, Plaintiff seeks to pursue her state-law claims as a constructive ERISA

benefits claim.[9]  After Plaintiff's voluntary dismissal of her ADEA claim and the

recasting of her state-law claims, the claims which remain in this action include (i)

a claim for benefits under ERISA and (ii) a claim for retaliation under ERISA.[10]

---

[8]  See also Franklin v. QHG of Gasden, 127 F.3d 1024, 1027 (11th Cir. 1997); Butero v. Royal Maccabees Life Ins. Co., 174 F.3d 1207, 1215 (11th Cir. 1999).

[9]  Defendant implicitly concedes that ERISA provides the proper authority and framework under which Plaintiff's claims should be brought and analyzed, and the Court finds Defendant was aware of the nature of Plaintiff's ERISA benefits claim.  (See Def.'s Reply to Pl.'s Opp'n at 1-4; Def.'s Mot. for Summ. J. at 1, 7.) See, e.g., Darcangelo v. Verizon Comms., Inc., 292 F.3d 181, 187 (4th Cir. 2002) ("What was a state claim for breach of contract becomes a federal claim for the enforcement of contractual rights under § 502(a)(1)(B)."); Clement v. Aetna Life Ins. Co., 355 F. Supp. 2d 813, 816-17 (M.D.N.C. 2005) ("Plaintiff's claim for breach of contract will not be dismissed but will be treated as a federal cause of action brought under ERISA § 502(a)(1)(B).  Amendment of the complaint is unnecessary.").  Accordingly, the Court considers Plaintiff's state-law claims to be a claim for benefits under ERISA.

[10]  In her response brief, Plaintiff asserts for the first time a claim for breach of fiduciary duty.  (Pl.'s Opp'n at 16-17.)  Plaintiff did not assert this claim in her complaint, did not seek to amend her complaint, and failed to raise it any time prior to the filing of her response brief, and the claim thus is not properly before the Court.  See Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006) (holding district court correctly refused to address claim of retaliation which was not included in complaint); Fed. R. Civ. P. 8(a) (requiring that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief").

A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  <u>Id.</u>

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  <u>United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.</u>, 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."

Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must

not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d

at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party," summary judgment for the moving party is

proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).

> B.    ERISA Benefits Claim

> 1.    *Standard of Review*

The Supreme Court has established three distinct standards for evaluating a

plan administrator's decision to deny benefits under a plan governed by ERISA:

(1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary

and capricious where the plan grants the administrator discretion; and (3)

heightened arbitrary and capricious where the plan grants the administrator

discretion but the administrator operates under a conflict of interest.  See Firestone

Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Williams v. BellSouth

Telecomms., Inc., 373 F.3d 1132, 1134 (11th Cir. 2004).[11]  Here, Defendant

---

[11]  The Eleventh Circuit has summarized the standards of review:

*De novo* review . . . offers the highest scrutiny (and the least judicial

contends the 1994 Plan provides the plan administrator with "sole discretion" in making benefit determinations, and, accordingly, a review of the denial of benefits is subject to the arbitrary and capricious standard of review.[12]  (Def.'s Mot. for Summ. J. at 8.)

---

deference) to the administrator's decision.  In fact, we accord *no* deference there, since, no judgment/discretion was exercised in making the determination (*i.e.*, there is no discretion to which we would defer).

In contrast, where the administrator has discretion (*i.e.*, applies his own judgment) in making plan decisions, we review under the arbitrary and capricious standard (which is substantively the same as the "abuse of discretion" standard).  We use it to avoid judicial second guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny).

Finally, where the administrator has discretion but exercises it under a conflict of interest, we apply "heightened arbitrary and capricious" review.  There we apply a level of deference (and conversely, scrutiny) somewhere between what is applied under the *de novo* and "regular" arbitrary and capricious standards.

Williams, 373 F.3d at 1137 (internal citations omitted).

[12]  The 1994 Plan reserved to the plan administrator "the sole discretion, authority, and responsibility to interpret and construe the Plan Statement and to determine all factual and legal questions under the Plan, including but not limited to . . . the entitlement of employees . . . and the amounts of [employee's] respective benefits."  (1994 Plan, Section 8.1.)

-12-

Plaintiff does not argue there is a conflict of interest, and has not provided

any evidence or argument of a conflict.[13]  Instead, Plaintiff argues that *de novo*

review is appropriate because the 1990 Plan -- the plan in effect at the time

Plaintiff was hired -- is the relevant plan for determining the discretion provided to

the plan administrator, and the 1990 Plan does not grant the administrator

sufficient discretion to apply the arbitrary and capricious standard.  Plaintiff does

not provide any legal authority for the proposition that the 1990 Plan determines

the level of review.  In this case, Plaintiff's claim is that the plan administrator

acted improperly in denying Plaintiff's claim for benefits in 2004.  Because the

Court is tasked with reviewing the plan administrator's decision in 2004 regarding

Plaintiff's claim for benefits in 2004, the Court finds the discretion afforded to the

plan administrator in the 1994 Plan -- the plan in effect in 2004 -- is the relevant

grant of discretion for the purpose of determining the appropriate level of judicial

review.  See, e.g., Podolan v. Aetna Life Ins. Co., 909 F. Supp. 1378, 1384 (D. Id.

1995) ("It was in 1993 that the claim for wrongful termination of benefits arose

---

[13]  See also Williams, 373 F.3d at 1138 (describing two-step, burden-shifting
approach to heightened arbitrary and capricious review, beginning with the
requirement that "claimant show[] that the administrator of a discretion-vesting
plan is conflicted").

and it is the Plan administrator's acts in 1993 that are being reviewed by the Court. Therefore, the Court concludes that it is the 1988 Plan governing the administrator's conduct in 1993 that must be considered in determining the scope of review over the administrator's decisions.").  Accordingly, an arbitrary and capricious standard of review applies in this case.[14]

"In determining whether the denial of the [plan participant's] claims was arbitrary and capricious, 'the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.'"  Dyce v. Salaried Employees' Pension Plan of Allied Corp., 15 F.3d 163, 166 (11th Cir. 1994) (citing Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989)).  The arbitrary and capricious standard of review is "substantively the same as the 'abuse of

_____

[14]   The result in this case would not change even if the Court considered the 1990 Plan to determine the appropriate standard of review.  The 1990 Plan provides:  "The Committee shall make such determinations as may be required from time to time in the administration of the Plan. . . .  All decisions on claims and on requests for a review of denied claims shall be made by the Committee."  (1990 Plan, Sections 8.1, 8.4.3(b).)  This grant of authority is sufficient to trigger the arbitrary and capricious standard of review.  See, e.g., Guy v. Southeastern Iron Workers' Welfare Fund, 877 F.2d 37, 39 (11th Cir. 1989) (applying arbitrary and capricious standard of review when plan conferred upon the administrator "'full and exclusive authority to determine all questions of coverage and eligibility' and 'full power to construe the provisions of [the] Trust'").

-14-

discretion' standard," and is designed to "avoid judicial second guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny)" to benefits determinations.  Williams, 373 F.3d at 1137; HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 994 (11th Cir. 2001) ("We cannot over emphasize the importance of the discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo*, review is that a court defers to the discretion afforded the claims administrator . . . .").  The standard applies to both the plan administrator's interpretation of plan terms and its factual determinations.  Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1450-52 (11th Cir. 1997) (noting the Eleventh Circuit's consistent application of the abuse of discretion standard of review to both factual findings and plan interpretation and applying this arbitrary and capricious standard of review to a plan administrator's factual findings); Torres, 346 F.3d at 1329.

Review under the arbitrary and capricious standard has two steps.  First, the court must determine whether Defendant's benefits denial decision is "*de novo* wrong" -- *i.e.*, the court disagrees with the administrator's decision.  Williams, 373 F.3d at 1138.  If not, then the court's inquiry ends and the decision is affirmed.  Id. If the administrator's decision is *de novo* wrong, then the court proceeds to the

second step and evaluates whether reasonable grounds supported the decision.  Id.
If the decision is supported by reasonable grounds, then the decision was not
arbitrary and capricious and the decision is affirmed.[15]  Id.  If no reasonable
grounds exist, then the decision is reversed.  Id.

2.    *Plaintiff's Claim for Benefits*

Plaintiff claims Defendant was required to compute her Benefit Service
using her years of service with Northwest Airlines.  Defendant argues "under the
plain language of the Pension Plan, [Plaintiff]'s employment as a union employee
with Northwest Airlines is not recognized employment and can not [sic] be
considered when calculating Benefit Service."  (Def.'s Mot. for Summ. J. at 10.)
Plaintiff does not contest Defendant's interpretation of the 1994 Plan, nor does she
claim the 1994 Plan is ambiguous.  Instead, Plaintiff claims the 1990 Plan is the
relevant plan and that the terms of the 1990 Plan regarding the computation of her
Benefit Service are ambiguous.  (Pl.'s Opp'n at 10-13.)

---

[15]  "If the court determines that the administrator's interpretation is
reasonable, then this wrong but reasonable interpretation is entitled to deference
even though the claimant's interpretation is also reasonable."  HCA, 240 F.3d at
994.

The Court first considers whether Defendant's interpretation of Plaintiff's Benefits Service is "wrong."  See HCA, 240 F.3d at 994 n.23 ("'Wrong' is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation.").  In doing so, the Court must consider not only the legal correctness of Defendant's interpretation, but also whether Plaintiff has proposed a reasonable alternative interpretation of the Plan. Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1570 (11th Cir. 1990).  If the terms controlling the computation of her Benefit Service are ambiguous, and Plaintiff establishes a reasonable interpretation, then under *contra profertem*, the court accepts her interpretation as the correct one.  See Mordecai v. Standard Ins. Co., No. 04-14852, 2005 WL 2249896, at * (11th Cir. Sept. 16, 2005) (citing Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala., 41 F.3d 1476, 1481 (11th Cir. 1995)).[16]

---

[16]  Mordecai is an unpublished decision and, in accordance with 11th Circuit Rule 36-2, is not considered binding precedent. 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent.").  It is cited for its persuasive value only.

Having reviewed the record, as well as the parties' arguments on summary judgment, and viewing the facts in the light most favorable to Plaintiff, the Court does not find that the Defendant's decision to deny benefits was *de novo* wrong. To demonstrate she is entitled to the benefits she seeks, Plaintiff must show that Defendant was required to include Plaintiff's service with Northwest Airlines for the purpose of calculating Benefit Service with Defendant.  Plaintiff does not dispute that Defendant's Benefit Service analysis denying her plan benefits was correct under the terms of the 1994 Plan, and after reviewing the terms of the 1994 Plan, the Court finds Defendant's decision under the terms of the 1994 Plan was correct.

Plaintiff instead argues the 1990 Plan supplies the controlling provisions and that the 1990 Plan is ambiguous.  Assuming *arguendo* the 1990 Plan controls the analysis, the relevant provisions of the 1990 Plan are as follows:

- **Benefit Service** -- a measure of a Participant's service with the Employer in Recognized Employment . . . which is equal to the total years and fractions of years of the Participant's employment in Recognized Employment . . . .  (1990 Plan, Section 1.2.7.)

- **NWA and TWA.**  Service with Northwest Airlines, Inc. . . . before the date the Participant transfers to employment with the Employer . . . shall be taken into account as if it were equivalent service with the Employer.  (<u>Id.</u>, Section 1.2.7(c).)

-18-

- **Employer** -- the Principal Sponsor, any entity affiliated with the Principal Sponsor that adopts the Plan pursuant to Section 7.4 and any successor thereof that adopts the Plan.  (Id., Section 1.2.14.)

- **Recognized Employment** -- all employment with the Employer, excluding, however:  (a) employment in a unit of employees whose terms and conditions of employment are subject to a collective bargaining agreement between the Employer and a union representing that unit of employees . . . .  (Id., Section 1.2.27.)

The relevant portions of the 1990 Plan listed above are unambiguous and establish that Defendant was not  required to include Plaintiff's Northwest service for the purpose of calculating Benefit Service with Defendant.[17]  The Benefit Service definition refers to service in Recognized Employment, which is defined in Section 1.2.27.  Section 1.2.27 explicitly excludes from Recognized Employment service while represented by a union.[18]  It is undisputed that while employed by

_____

[17]  The Summary of Worldspan Employees' Pension Plan supports this interpretation.  It states:  "For example, since employment in a union represented job classification for the employee would not be recognized employment, employment in a union represented classification for Northwest Airlines, Inc., . . . would not be taken into account in determining benefit service under this plan."  (DSF ¶ 32.)  The summary plan is not controlling, but its application to the facts in this case is notable.

[18]  Section 1.2.7(c) simply provides that service with Northwest Airlines is equivalent to service with Defendant.  Therefore, Recognized Employment under Section 1.2.27, read in conjunction with Section 1.2.7(c), unambiguously excludes from Recognized Employment service with Northwest Airlines while represented

Northwest Airlines Plaintiff was a member of the International Airline Machinists union.  (DSMF ¶ 9.)  Accordingly, Defendant's exclusion of Plaintiff's service at Northwest Airlines from the calculation of her Recognized Employment and Benefit Service is mandated by the terms of the Plan.[19] [20]

---

by a union.

[19]  Because the administrator's decision was correct, the review of the benefits decision ends here under any of the review standards.  See Williams, 373 F.3d at 1138 (stating the first step of review is to determine if the decision is *de novo* "wrong"; "if it is not, then end the inquiry and affirm the decision").

[20]  While the Court is not required to conduct the second step of the arbitrary and capricious standard analysis, on the facts here, it is clearly evident there are reasonable grounds to support Defendant's decision to deny benefits.  See generally Dyce v. Salaried Employees' Pension Plan of Allied Corp., 15 F.3d 163, 166 (11th Cir. 1994) ("In determining whether the denial of the [plan participant's] claims was arbitrary and capricious, 'the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.'") (citing Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989)); Cagle v. Bruner, 112 F.3d 1510, 1518 (11th Cir. 1997) ("Under the arbitrary and capricious standard of review, [the court is] limited to deciding whether the [plan administrator's] interpretation of the plan was made rationally and in good faith.").

3.    *Equitable Estoppel*

Plaintiff argues that the 1990 Plan is, at a minimum, ambiguous, and that the equitable estoppel doctrine should apply.  (Pl.'s Opp'n at 10-16.)  The Eleventh Circuit "recognize[s] a very narrow common law doctrine under Section 502(a)(1)(B) for equitable estoppel, which is available where the plaintiff can show that (1) the relevant provisions of the plan at issue are ambiguous, and (2) the plan provider or administrator has made representations to the plaintiff that constitute an informal interpretation of the ambiguity."  Jones v. Am. Gen. Life & Accident Ins. Co., 370 F.3d 1065, 1069 (11th Cir. 2004).  (See also Pl.'s Opp'n at 9-10.) "However, whether proceeding on a breach of contract or equitable estoppel theory, an ERISA plaintiff can only succeed on a Section 502(a)(1)(B) claim if [s]he can establish that the plan at issue is at least ambiguous with respect to the relevant benefits for which [s]he claims entitlement."  Id. at 1070.

Because the Court finds the relevant provisions of the Plan are not ambiguous[21], the equitable estoppel doctrine does not bear on this case and the plan

---

[21]  The determination of whether the terms of a contract are ambiguous is a question of law to be decided by the court.  See Stewart v. KHD Deutz of Am., Corp., 980 F.2d 698, 701 (11th Cir. 1993).  "When construing the terms of an ERISA policy, ambiguity exists if the policy is susceptible to two or more reasonable interpretations that can fairly be made, and one of these interpretations

must be enforced according to its written terms.  The Court further notes the

informal statements, both oral and written, relied upon by Plaintiff to establish her

equitable estoppel claim, (see Pl.'s Opp'n at 14-16), are insufficient to vary the

unambiguous terms of the Plan.  See Alday v. Container Corp. of Am., 906 F.2d

660, 666 (11th Cir. 1990) (holding informal written booklet summarizing benefits,

letters to employees and seminar documents cannot modify an unambiguous

ERISA plan document); Nachwalter v. Christie, 805 F.2d 956, 959-60 (11th Cir.

1986) (holding oral communications cannot modify an unambiguous ERISA plan

document).

Because the unambiguous terms of the Plan exclude Plaintiff's service with

Northwest Airlines from the computation of her Benefit Service, the benefits

sought by Plaintiff are not permitted by the ERISA plan and the decision to deny

Plaintiff's request for benefits was correct.  Accordingly, summary judgment on

Plaintiff's ERISA benefits claim is GRANTED.

---

results in coverage while the other results in exclusion."  Luton v. Prudential Ins.
Co. of Am., 88 F. Supp. 2d 1364, 1370 (S.D. Fla. 2000) (citations omitted); see
also Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207-1208 (11th Cir.
2003) ("The reasonableness of [a party's interpretation] must be judged from the
perspective of the average plan participant.") (citing 29 U.S.C. § 1022(a)).

D.    Retaliation

Section 510 of ERISA makes it unlawful "to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which [s]he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ."  29 U.S.C. § 1140.  In this case, Plaintiff focuses on the first protection of Section 510, alleging that "Defendant retaliated against her after she filed a complaint regarding her pension benefits and encouraged other former Northwest employees to do the same . . . ." (Pl.'s Opp'n at 18-19.)

> The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights.  A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge.  This burden can be met either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by McDonnell Douglas Corp. v. Green.

Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1222-23 (11th Cir. 1993) (citations omitted).[22]

Under the McDonnell Douglas framework, plaintiff must establish a prima facie case of retaliation with respect to the adverse employment action in question. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  If the plaintiff makes this prima facie showing, the defendant must articulate a legitimate, nonretaliatory reason for the adverse employment action.  Id. at 253.  If the defendant satisfies this requirement, the burden then shifts to the plaintiff to show the defendant's legitimate, nonretaliatory reason is a pretext for unlawful retaliation.  Id.

     1.    *Prima facie case*

The Court first addresses whether Plaintiff can establish a prima facie case of retaliation in violation of ERISA.  "In the context of a § 510 claim alleging unlawful discharge, a plaintiff may establish a prima facie case of discrimination by showing (1) that [s]he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an

---

[22]  Plaintiff admits "there is no direct evidence of discrimination."  (Pl.'s Opp'n at 19.)

inference of discrimination."  Clark, 990 F.2d at 1223; Wolf v. Coca-Cola Co., 200

F.3d 1337, 1343 (11th Cir. 2000).[23]  "To satisfy the last element the plaintiff does

not have to prove discriminatory intent but must introduce evidence that suggests

interference with ERISA rights was a motivating factor."  Clark, 990 F.2d at 1223-

24.  "To survive summary judgment, therefore, a plaintiff must present evidence of

the employer's specific intent to violate ERISA; that is, evidence that the employer

intentionally discriminated against an employee to retaliate for the exercise of

rights, or to interfere with the attainment of entitled rights, under the plan or

ERISA."  Owens v. Storehouse, Inc., 984 F.2d 394, 399 (11th Cir. 1993); see also

Wolf, 200 F.3d at 1343-44 ("If the employer asserts a legitimate reason for the

discharge, the plaintiff may present evidence that the reason is a pretext masking

the specific intent to interfere with ERISA rights.").

   The parties do not dispute that Plaintiff can establish the first two

elements -- that she is entitled to ERISA's protection and was qualified for her

position.  Defendant argues summary judgment is appropriate because Plaintiff

cannot demonstrate a causal nexus between Plaintiff's exercise of her rights under

---

[23]  The parties agree this is the proper prima facie case of retaliation.  (See
Pl.'s Opp'n at 19-20; Def.'s Mot. for Summ. J. at 19.)

ERISA and her discharge.  Plaintiff claims she has presented sufficient evidence to

demonstrate Defendant's specific intent to violate ERISA because:  (i) there is a

close temporal proximity between Plaintiff's exercise of her ERISA rights and the

adverse employment actions taken by Defendant, and (ii) Defendant's stated

reasons for her discharge are inconsistent and not credible.[24]

    The Court first analyzes the temporal proximity between Plaintiff's assertion

of ERISA rights and adverse actions taken by Defendant.  On January 9, 2004,

Plaintiff complained to Defendant's Vice President of Human Resources about her

pension benefits, and, two days later, Plaintiff filed her pension benefits claim.  In

February 2004, Plaintiff told her supervisor, Ms. Boyd, of her pension claim, and,

on February 26, 2004, Ms. Boyd purportedly "redid [Plaintiff]'s earlier evaluation

---

[24]  Plaintiff also claims an inference of discrimination from her discharge can
be drawn because "Defendant would save $65,000 by denying her pension claim.
This number gets even bigger when multiplied by the four other former Northwest
employees with pension claims . . . ."  (Pl.'s Opp'n at 20-21.)  This argument is
unpersuasive for at least three reasons.  First, Plaintiff does not provide any basis
for suggesting Defendant considered the claimed pension savings in its decision to
discharge her.  Second, Plaintiff does not provide any evidence or analysis
regarding whether the amount of the claimed savings would be material to
Defendant.  Finally, that Plaintiff's interpretation of her ERISA benefits would
result in additional payments of $65,000 does not evidence any motivation for her
discharge.  Instead, assuming *arguendo* that the pension benefit savings would
influence Defendant, they would influence its benefits determination, which, as
opposed to her discharge, is not the claimed retaliatory act.

to suggest for the first time that there were problems with [Plaintiff]'s work."
(Pl.'s Opp'n at 22.)  On June 4, 2004, Plaintiff was informed that her employment
with Defendant was being terminated based, in part, on her negative performance
evaluation.   Defendant claims the four-month gap between Plaintiff's filing of her
pension benefits claim and her termination "belies [Plaintiff]'s contention that her
termination was in any way related to her pension dispute," (Def.'s Reply Br. at
11.), and that the negative performance evaluation is not an adverse employment
action upon which a claim of retaliation can be based.  Plaintiff contends the
retaliation began when she received her negative performance evaluation and
culminated in her discharge.  (Pl.'s Opp'n at 19.)

Defendant relies on Brown v. Snow, 440 F.3d 1259 (11th Cir. 2006), for the
proposition that a lower score on a performance evaluation does not constitute an
adverse employment action.  (Def.'s Mot. for Summ. J. at 10-11.)  In Brown, the
employee's evaluation was lowered but the employee still was rated "Fully
Successful" in the four evaluated performance categories.  440 F.3d at 1261.  The
Court in Brown held that a "lower score on the employee's performance
evaluation, by itself, is not actionable under Title VII unless [the employee] can
establish that the lower score led to a more tangible form of adverse action, such as

-27-

ineligibility for promotional opportunities." Id. at 1265.  The Court found the

plaintiff had not produced any evidence that he was denied promotion on the basis

of his lowered evaluation score, noting the "downgraded evaluation still described

[the plaintiff]'s performance as fully successful." Id. at 1266.  Brown is not

persuasive here for two reasons.  First, Plaintiff claims her job performance

evaluation was lowered from "Meets Expectation" to "Needs Improvement."

Second, viewing the evidence in the light most favorable to Plaintiff, the decision

to terminate her employment was made, in part, on the basis of her poor evaluation.

(See Pl.'s Opp'n at 22; Boyd Dep. at 77.)[25]  Although it is unclear whether the

---

[25] Ms. Boyd's deposition testimony on the reason for her discharge is not entirely clear.  Ms. Boyd testified:

> Q:  Did you decide to terminate or did you decide to put Ms. Melvin on that list due to her performance being poor?
> A:  Ms. Melvin was ranked along with the rest of the people in fares and pricing considering all duties of their job responsibilities.
> Q:  And among those duties, did you consider her performance to be poor?
> A:  Considering the variety of duties she was expected to perform, yes.

(Boyd Dep. at 77.)  This testimony is sufficient to draw a reasonable inference in favor of Plaintiff that she was discharged based in part on her negative evaluation.  (See also Pl.'s Statement of Material Facts in Dispute ¶ 16.)

performance evaluation, standing alone, is actionable as a claim of retaliation[26], viewing the facts in the light most favorable to Plaintiff the evaluation here led to Plaintiff's discharge, which, under Brown, is actionable.

A "close temporal proximity" between the assertion of rights and an adverse action is "sufficient circumstantial evidence of a causal connection for purposes of a prima facie case."  Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004). The Eleventh Circuit has held "that a period as much as one month between the protected expression and the adverse action is not too protracted."  Id. at 1220. However, a "three to four month disparity [has been] found to be insufficient to show causal connection."  Id.  Here, Plaintiff filed a written pension claim on January 11, 2004, and informed her supervisor of her pension claim in February 2004.  Plaintiff underwent another evaluation on February 21, 2004, and she received an overall rating of "Needs Improvement."  Subsequently, this evaluation

---

[26]  The Court finds Brown inapplicable on the basis of the factual differences presented by the instant case.  The Court notes the relevant holding in Brown is in doubt after Burlington Northern & Santa Fe Railway Co. v. White, 2006 WL 1698953, --- S.Ct. --- (June 22, 2006) (holding to establish actionable retaliation "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (quotations and citations omitted).

formed the basis for her discharge less than four months later.  Because of this

temporal proximity, the Court examines the context of the February 21, 2004

performance review to determine if a reasonable jury could infer retaliatory intent.

The Court has reviewed Plaintiff's performance review history from January

1, 1999 through September 16, 2003.  During this period Plaintiff's job

performance was evaluated four times.  These performance evaluations invariably

covered a full year's performance, occurred roughly a month after the conclusion

of the period being reviewed, and Plaintiff received positive marks[27] overall.  The

last of these four evaluations, the October 6, 2003 evaluation, covered the period

from September 16, 2002 through September 16, 2003.  Plaintiff received a rating

of "Meets Expectations" in every area of evaluation.

On February 21, 2004, Plaintiff was evaluated again.  This evaluation

covered the period from January 1, 2003 through December 31, 2003.  This

evaluation period overlapped with the period covered by the October 6, 2003

---

[27]  For example, in her January 27, 2000 and April 12, 2001 evaluations she
was rated "Is effective" in every category, and she was rated as "Meets
Expectations" in all categories in her June 27, 2002 and October 6, 2003
evaluations.

evaluation for nine of the twelve months being evaluated.[28]  In the February 21, 2004 evaluation, Plaintiff received an overall rating of "Needs Improvement," in contrast to the "Meets Expectations" rating she received in her October 6, 2003 evaluation.

Viewing the facts in the light most favorable to Plaintiff, the February 21, 2004 evaluation occurred within weeks of Plaintiff's filing of her pension claim, the timing of the February 21, 2004 evaluation was unusual, the February 21, 2004 and October 6, 2003 evaluations, which covered substantially similar periods of time, are facially inconsistent, and the February 21, 2004 evaluation led to Plaintiff's discharge.  The confluence of these facts, even where the period between the protected expression and her discharge was four months, causes the Court to conclude that a reasonable jury could infer that Defendant retaliated against Plaintiff for the exercise of her rights.[29] [30]

---

[28]  Plaintiff's title in both the October 6, 2003 and February 21, 2004 evaluations was "Sr Q/A Analyst."

[29]  For example, under the facts here where a downsizing was planned and enacted, the delay may be interpreted by a jury as a device to allow a wrongful discharge to be disguised by a downsizing.

[30]  Plaintiff also claims Defendant's intent to retaliate is evidenced by the fact "Defendant keeps changing the reason it contends [Plaintiff] was discharged."

Accordingly, Plaintiff has established a prima facie case of retaliation with respect to her negative evaluation and subsequent discharge, and the burden now shifts to Defendant to articulate a legitimate, nonretaliatory reason for its decision to discharge her.

2.    *Legitimate, nondiscriminatory reason*

The employer's burden in articulating a legitimate, nonretaliatory reason "is merely one of production; [the employer] need not persuade the court that it was actually motivated by the proffered reasons."  Wascura v. City of S. Miami, 257 F.3d 1238, 1243 (11th Cir. 2001) (quotations omitted).  In this case, Defendant asserts it "eliminated [Plaintiff]'s position as part of a cost-saving initiative in which [Plaintiff]'s job, and the jobs of several others, were sent to India."  (Def.'s

---

(Pl.'s Opp'n at 20.)  See, e.g., Bechtel Constr. Co. v. Sec'y of Labor, 50 F.3d 926, 935 (11th Cir. 1995) ("The pretextual nature of [the employer's] terminating [the plaintiff] is further demonstrated by [the employer's] shifting explanations for its actions.").  Plaintiff claims she first was told she was discharged because of lack of work but that now Defendant claims Plaintiff's work was sent overseas.  Plaintiff claims these reasons are not only inconsistent, but also are not credible because (i) Plaintiff and others in her department were busy before her discharge, (ii) most of her department still is performing their duties in Atlanta, (iii) Plaintiff trained new personnel to take over her position and (iv) Plaintiff's supervisor testified that the decision to terminate her was not related to the amount of work in the department. (Pl.'s Opp'n at 20, 24.)  Because the Court finds Plaintiff already has satisfied her prima facie case of retaliation, it is not necessary to determine if these explanations are consistent.

Reply Br. at 12.)  This justification constitutes a legitimate, nonretaliatory reason for Defendant's decision.

        3.    *Pretext*

Because Defendant has articulated a legitimate, nonretaliatory reason for its decision, Plaintiff, to avoid summary judgment, must present sufficient evidence from which a reasonable jury could conclude Defendant's stated reason was a pretext for unlawful retaliation.  See Smith v. BellSouth Telecomms., Inc., 273 F.3d 1303, 1314 (11th Cir. 2001).  "[The Eleventh Circuit's] pretext analysis focuses on a narrow question:  Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?"  Walker v. Prudential Prop. & Cas. Ins. Co., 286 F.3d 1270, 1276 (11th Cir. 2002); see also Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) ("The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.") (citations omitted).

Here, the parties collapse the McDonnell Douglas framework and do not argue pretext separately from the prima facie case.  (Def.'s Mot. for Summ. J. at

18-21; Pl.'s Opp'n at 23-25; Def.'s Reply Br. at 11-14.)  Having carefully reviewed the evidence of record in this case, and the arguments of the parties, the Court finds Plaintiff has submitted sufficient evidence from which a reasonable juror could find Defendant's legitimate, nonretaliatory reason for her discharge was pretextual.  Viewing the facts in the light most favorable to Plaintiff, the circumstances of her February 21, 2004 evaluation and subsequent discharge, discussed above, constitute evidence sufficient for a reasonable juror to conclude that Defendants' legitimate, nonretaliatory reason for Plaintiff's discharge was pretextual.  See generally Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998) ("[T]he showing of pretext need not necessarily involve further evidence; the evidence in a prima facie case might be strong enough to also show pretext.").[31]  Accordingly, summary judgment on Plaintiff's ERISA retaliation claim is DENIED.

## III.   CONCLUSION

For the reasons stated above,

---

[31]  The Court is not allowed to supplant the function of the jury to resolve disputed facts even if the dispute is not an acute one.

**IT IS HEREBY ORDERED** that Defendant Worldspan, L.P.'s Motion for Summary Judgment [60] is **GRANTED IN PART** and **DENIED IN PART**. Defendant's motion is **GRANTED** with respect to Plaintiff's claim for ERISA benefits and Defendant's motion is **DENIED** with respect to Plaintiff's retaliation claim.

**SO ORDERED** this 12th day of July, 2006.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE